IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

JOSE GRACIAS,                               )
                                            )
            Plaintiff,                      )
                                            )
                                            )   Case No. 1:03-CV-1767-TMP
                                            )
DEKALB COUNTY BOARD                         )
OF EDUCATION, CHARLES D. WARREN,            )
and PAULETTE DAVIS,                         )
                                            )
            Defendants.                     )

<u>**MEMORANDUM OPINION**</u>

  This matter is before the court on the motion for summary judgment filed October 1, 2004, by defendant Paulette Davis.[1]  The motion was supported by evidence, and the plaintiff filed a brief in opposition on October 19, 2004, supported by evidence.  Defendant Davis filed a brief in reply on October 28, 2004.  Defendant Davis also filed a motion to strike portions of the plaintiff's evidence, which also has been briefed.  A hearing on the pending motions was held January 27, 2005.  The parties have consented to the exercise of jurisdiction by the undersigned pursuant to 28 U.S.C. § 636(c).

---

[1]  Defendant Davis and defendants Warren and the DeKalb County Board of Education all filed motions for summary judgment on June 10, 2004.  These motions were mooted, however, by the entry of a new discovery scheduling order entered on August 3, 2004.  Defendant Davis renewed her motion on October 1, 2004, but the other two defendants have never renewed theirs.

## II.  SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  Celotex, 477 U.S. at 322-23.  There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim."  Id. at 323.

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions of file,' designate 'specific facts showing that there is a genuine issue for trial.'"  Id. at 324 (quoting Fed. R. Civ. P. 56(e)).  The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings.  Celotex, 477 U.S. at 324.  "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient

to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The substantive law will identify which facts are material and which are irrelevant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. His guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52; see also Bill Johnson's Restaurants, Inc. v. N.L.R.B., 461 U.S. 731, 745 n.11 (1983). However, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. Anderson, 477 U.S. at 249 (citations omitted); accord Spence v. Zimmerman, 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. Anderson, 477 U.S. at 254; Cottle v. Storer Communication, Inc., 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts

are the function of the jury, and therefore the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor.  Anderson, 477 U.S. at 255.  The non-movant need not be given the benefit of every inference but only of every reasonable inference.  Brown v. City of Clewiston, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## II.  FACTS FOR SUMMARY JUDGMENT PURPOSES

For purposes of summary judgment and in accordance with Rule 56 of the Federal Rules of Civil Procedure, the following facts are undisputed, or, if disputed, have been taken in a light most favorably to the non-moving plaintff.

At all times relevant to this lawsuit, plaintiff Jose Gracias, now age 21, was a student at Collinsville High School, a public high school in DeKalb County, Alabama.  Defendant Paulette Davis was the principal at the high school, which is operated by the DeKalb County Board of Education ("the school board").  Defendant Charles Warren was the superintendent of schools.  One of defendant Davis's as principal was imposing discipline upon students who violated rules of conduct.  The type and degree of discipline to apply to specific behaviors was within her discretion, although she followed general practices, of which students were informed, to impose predictable punishments for certain behaviors.  Generally, she imposed a disciplinary action of three days of alternative school for fighting.

Gracias, a native of El Salvador, is a legal resident of the United States.  At all times relevant to this action, he lived in DeKalb County with his sister, Marina Padilla, who also was his legal guardian when he was a minor.  Gracias enrolled at Collinsville High School in November 2001,

which was near the end of the first semester term of that school year.  He was placed in a tenth-grade homeroom, but took eleventh-grade classes.  Upon enrollment, he was given a copy of the *Code of Student Conduct and Student Handbook*, which contained the following attendance policy:

> [A]fter a student has been absent four (4) times during the term, the student must present a professional excuse (doctor, dentist, etc.) to receive credit in that course unless the principal specifically grants an exception because of unusual or extenuating circumstances.  Three unexcused tardies will count as one unexcused absence.

The attendance policy also called for school officials to notify the student and parent or guardian when a student was in danger of failing due to absences.  Gracias understood that the rule regarding absences would count each day of an unexcused absence and would count three tardies as an absence.  Neither Gracias nor Padilla received any notice from the school that he was subject to failing prior to the issuance of the report cards.

During the second semester of the 2001-2002 school year, Gracias was disciplined on several occasions by school authorities.  He was sent to alternative school for three days in January 2002.  Gracias does not remember what action prompted the discipline.[2]  On March 8, 2002, he was suspended for three days for hitting another student.  Gracias admits that he hit another student, Francisco Morales, in the face.  He admits that he deserved the resulting suspension.  (Gracias Depo., pp. 49-50).  The form Davis filled out to effect the suspension noted that the alternative school was

---

[2]    Gracias's attorneys argue in their brief that Davis "trumped up" disciplinary charges against Gracias, and repeatedly sent him to a "prison-like alternative school."  This argument is pure hyperbole with no basis in fact, and the court therefore does not consider the imposition of the punishment of alternative school as a basis of any relief in this case.

full at that time and that suspension was selected because the usual punishment of alternative school was not an option on the date of the fighting incident.  On April 5, 2005, Gracias was punished by being sent to detention as a result of being tardy to school on five occasions.

On April 23, 2002, a sheriff's deputy assigned to patrol the school, James Allen, cited Gracias for reckless driving on campus.  After reviewing the report, Davis revoked Gracias's privilege of driving on school property.[3]  Gracias denies that he was driving recklessly.[4]  On April 29, 2002, the same officer cited Gracias for driving on school property after his privilege had been revoked.  Gracias admits he parked his car next to the school fieldhouse, but says he didn't know that the area was on school property.  Allen has testified that his reports about Gracias were not in any way influenced by Davis, and that Davis never told him to watch Gracias or to take any action with regard to Gracias.  As punishment for driving after revocation, Gracias was sent to alternative school for three days.[5]

---

[3]     Davis has testified that Gracias's conduct could have been classified as a "level three" offense that would justify expulsion, but that she chose to treat the offense as a "level two," and not to suspend or expel Gracias as a result.

[4]     Plaintiff's counsel makes wildly overblown and, at best, overzealous statements regarding Davis, alleging, for example, that she "had the school cop follow Mr. Gracias around to find an excuse to get rid of him."  But the evidence supporting that statement is the deposition of one of the school teachers, who simply said that Gracias had told him that Gracias believed that Officer Allen was "watching him real close."  (Edwards Depo., p. 20).  Even Gracias's *own* statement, as related by the teacher, does not impute that activity in any way to Davis.  The facts further demonstrate that Allen did not work for Davis, or even for the school system, but was employed by the county sheriff's department.

[5]     Again, Davis's act of imposing discipline in the form of alternative school is not considered by this court to be a claim of discrimination raised by Gracias or supported by any evidence.  Gracias does not allege that alternative school was a harsher form of discipline than that ordinarily imposed for such an infraction, nor does he allege or provide any evidence that the same

Padilla met with Davis on at least one occasion to discuss Gracias's problems.  She alleges that Davis told her Gracias should drop out of school and get his GED instead of remaining in high school for two additional years.  Padilla says Davis also told her she had "a strong feeling" that Gracias was using drugs.  She then took Padilla to Gracias's locker and searched it, but found no drugs.[6]  Padilla has testified that she believed Gracias had been unjustly suspended at the time of the meeting, but that she did not complain of or question that suspension when she met with Davis.

At the end of the school year, Gracias received a report card, signed by Davis, that indicated he had failed due to excessive absences.  Gracias does not deny that, if he was absent four days during the term and if those absences were unexcused, he deserved the failing grades under school policy.  The report card issued at the end of the 2001-2002 school year showed that Gracias had three absences during the first nine weeks and five absences during the second nine weeks, along with seven tardies. (Gracias Depo., Ex. 11).[7]  Gracias's tally of absences was based on attendance records maintained in the school computer, which are input by the school secretary, Penny Brown, who records student absences as excused or unexcused based upon whether the student presents a

_____

infraction was punished less severely when committed by non-Hispanic students.

[6]       Plaintiff's complaint does not make any claim pursuant to the Fourth Amendment arising from the search.

[7]       Plaintiff disputes the defendant's assertion that he had a total of seven tardies during the relevant school term, but concedes that he had six. (Reply brief at n. 6.) The number of absences in excess of the three imposed for the suspension also is disputed.  Because the court views the evidence in the light most favorable to the plaintiff, the court considers Gracias to have been absent without excuse only during the three-day suspension, and twice due to the six undisputed tardies. Under the attendance policy, this still constitutes five unexcused absences.

doctor's excuse within three days of the absence.[8]  Davis testified that she was confident that Brown

correctly entered the attendance information, and that she had no reason to doubt the accuracy of

Brown's records.  Gracias has testified that he brought excuses signed by his guardian for some of

his absences, but has not specifically testified as to when or how many excuses he provided.[9]

Gracias alleges that he was given failing grades for the 2001-2002 school year because of his

race, Hispanic.  Davis has responded that Gracias was given failing grades because he had more than

four unexcused absences, and that school policy requires that students with four or more unexcused

absences be failed.  Gracias further asserts generally that the discipline he received at Collinsville

High School was based on his race, and that non-Hispanic students received more lenient treatment.

Gracias has not named any non-Hispanic student who engaged in the same misconduct as Gracias

and was treated differently.[10]

---

[8]     Davis testified that she did not "change" Gracias's report card to reflect failure, but that a school employee who handles the report cards brought approximately 20 report cards to her, told her that those 20 students were due to fail because of excessive unexcused absences, and asked her to personally sign the cards because the computer-generated cards did not properly reflect the failure due to absences and a parent who saw the card would not be able to determine that the student had failed.  Davis testified that she signed the cards given to her and wrote the notation "failure due to absences" above her signature.

[9]     Gracias's attorneys make other allegations that the weekly attendance reports are missing from one teacher's records for the week Gracias was suspended, and that Padilla was not notified of the absences as was the school's policy.  Even so, the plaintiff does not dispute that he had at least three unexcused absences as a result of the suspension, and at least six tardies, which count as two additional unexcused absences.   Plaintiff also does not dispute that he understood the policy regarding absences.  Accordingly, even if plaintiff were able to demonstrate that he was recorded as absent on days that he was present, or that he was excused on days he was deemed unexcused, he still would have been due to fail for the undisputed absences and tardies.

[10]    Gracias makes a vague assertion that two eighth-grade Caucasion students engaged in a fight and were not suspended or sent to alternative school, but he cannot identify who the

Approximately 50 percent of Collinsville High School students at that time were Hispanics.[11] At the end of the 2001-2002 school year, 24 Collinsville High School students failed due to excessive unexcused absences. Only five of the 24 were Hispanic. There is no evidence regarding the racial makeup of the students who were sent to alternative school or otherwise disciplined.[12]

### III.  DISCUSSION

Defendant seeks summary adjudication of all of plaintiff's claims against her on the following grounds: (1) that plaintiff's § 1981 claim is merged with his § 1983 claim and is, therefore, due to be dismissed; (2) that defendant is entitled to Eleventh Amendment immunity for all claims against her in her official capacity; (3) that she is entitled to qualified immunity for plaintiff's § 1983 claim brought against her in her individual capacity; and that (4) plaintiff has failed to make a *prima*

---

students were, and alleges only that he does not believe they were disciplined because he saw them at school every day after the fight. Gracias cannot identify the date of the incident, the nature of the altercation, or the students involved. There is simply insufficient evidence regarding the incident to allow this court to conclude that the fight between the young non-Hispanic students was similar to Gracias' act of hitting Morales in the face. Gracias further alleges that Tony Ramsey, a white student, had three unexcused absences and was not failed. Three absences, however, is not sufficient to trigger the "four absence" rule, and plaintiff makes no allegation that Ramsey was similarly situated to Gracias in terms of tardies.

[11]     Davis explained that the percentage of Hispanic students includes about 10 percent of the student body who are from Guatemala, but who list "Indian" as their ethnicity.

[12]     The report cards of the failing students are in evidence, but do not record the race of the student. Davis recites the racial division among the 24 failing students in her affidavit, attached as Exhibit 1 to Defendant's Brief in Opposition. That fact is not contested. No evidence is presented concerning the racial makeup of students receiving alternative school or suspension; but the burden here is on plaintiff to offer evidence that supports his claim of discrimination, and Gracias offers no statistical evidence of any type.

*facie* case of discrimination.[13]   The court agrees that defendant Davis is entitled to summary judgment.

### A.  Section 1981

Defendant asserts that no cause of action may lie against her pursuant to § 1981 because § 1983 provides the exclusive remedy for discrimination against a state actor.  Plaintiff does not dispute that § 1981 does not provide him with a remedy for the actions complained of; rather, plaintiff's counsel concedes that his action is brought pursuant to 42 U.S.C. § 1983.  (Plaintiff's Brief in Opposition, p. 11).  Accordingly, the court addresses plaintiff's claims in the context of § 1983, and the motion as to any claim asserted on the basis of § 1981 is due to be granted.

### B.  Eleventh Amendment Immunity

In her official capacity as principal of Collinsville High School, defendant seeks protection from suit by the absolute immunity provided to a state or one of its agencies under the Eleventh Amendment.   The Eleventh Amendment provides that:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against any one of the United States by Citizens of another State or by Citizens or Subjects of any Foreign State.

---

[13]      Although plaintiff asserts claims based on Title VI, Davis as an individual is not a proper defendant to any Title VI education discrimination claim, and the only proper defendant is the school board.  Jackson v. Katy Ind. School Dist., 951 F. Supp. 1293, 1298 (S.D. Tex. 1996).

The amendment has been extended also to bar suits against a state that are brought by its own citizens.  Hans v. Louisiana, 134 U.S. 1, 10, 10 S. Ct. 504, 505, 33 L. Ed. 842 (1890).  While the immunity extends to states and state officials, it does not apply to counties, municipal corporations, or other "political subdivisions," and instead relies upon a determination of whether the person or entity seeking immunity is an "arm of the state."  Mount Healthy Board of Education v. Doyle, 429 U.S. 274, 280, 97 S. Ct. 568, 50 L. Ed. 2d 471 (1977).  That inquiry is governed by federal law, not state law.  Howlett by and through Howlett v. Rose, 496 U.S. 356, 110 S. Ct. 2430, 2436, 110 L. Ed. 2d 332 (1990).

In the instant case, defendant has failed to demonstrate that, as principal of the high school and an employee of a county school board, Davis is an agent of the state who is entitled to that protection under federal law.  See, e.g., Stewart v. Baldwin County Board of Education, 908 F.2d 1499, 1510 (11th Cir. 1990)(holding that a county school board in Alabama, which has the means to raise funds and use county sales and use taxes to support schools, is not "an arm or alter ego" of the state).  Accordingly, the immunity does not apply to shield Davis in an official capacity from plaintiff's discrimination claims.

Moreover, plaintiff argues that Eleventh Amendment immunity protection was abrogated by Congress when it enacted Title VI of the Civil Rights Act, which provides:

> A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal Court for a violation of ... title VI of the Civil Rights Act of 1964, or the provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance.

42 U.S.C. § 2000d-7. Defendant does not dispute that the DeKalb County Board of Education is a recipient of federal financial assistance and that the board, and hence its employees, are not entitled to Eleventh Amendment immunity from actions arising under Title VI. Accordingly, plaintiff's official-capacity claims are not subject to dismissal based on the Eleventh Amendment, and defendant's motion on that ground is due to be denied.

The court recognizes, nonetheless, that § 1983 suits against a public employee in her official capacity is simply another way of pleading the claim against the official's public employer. As the Eleventh Circuit has explained:

> The Supreme Court in Kentucky v. Graham, 473 U.S. 159, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985), explained the significance of suits against state officials in their official capacities:
>
>> Official-capacity suits ... "generally represent only another way of pleading an action against an entity of which an officer is an agent." As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. It is not a suit against the official personally, for the real party in interest is the entity.
>
> Id. at 165-66, 105 S. Ct. at 3105 (citations omitted); see also Will v. Michigan Dept. of State Police, 491 U.S. 58, 71, 109 S. Ct. 2304, 2311, 105 L. Ed. 2d 45 (1989).

LaMarca v. Turner, 995 F.2d 1526, 1542 (11th Cir. 1993). Although the instant case is not one against a *state* official, it is a suit against a public official. Thus, the action against Davis, in her official capacity as principal of Collinsville High School, is "in all respects other than name, to be treated as a suit against the entity," the DeKalb County Board of Education. Further, because the Board of Education already is a defendant in this action, the assertion of official-capacity liability

12

against Davis is redundant and unnecessary.[14]  For that reason, therefore, the only claim properly pleaded against Davis is against her in her *individual* capacity.  Insofar as plaintiff has attempted to sue her officially, it is deemed to be a claim against the Board of Education.

### C.  Qualified Immunity

Defendant Davis also asserts that she is entitled to qualified immunity from suit for all § 1983 claims brought against her in her *individual* capacity.  It is well settled that qualified immunity protects government officials performing discretionary functions from civil suit, and from liability, where their conduct does not violate "clearly established statutory or constitutional rights." Hope v. Pelzer, 536 U.S. 730, 739, 122 S. Ct. 2508, 153 L. Ed. 2d  666 (2002), quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396 (1982).  Whether an act is a discretionary function under federal law relies not upon whether it is ministerial or requiring judgment, but rather whether the act is a "legitimate job-related function."  Holloman *ex rel.* Holloman v. Harland, 370 F.3d 1252 (11th Cir. 2004).  Furthermore, it is not the manner in which the function is carried out, but whether the function was within the defendant's authority.  As the court stated in Holloman, a court need not ask whether it is within a defendant's authority "to suspend an employee for an improper reason," but only to ask whether "the administration of discipline was within the defendant's discretionary duties."  Id.  Once the defendant establishes that she was engaged in a

---

[14]  Plaintiff has no standing to seek prospective injunctive relief from Davis as he has graduated from school and is no longer subject to her direction or discipline.

discretionary function, the burden shifts to the plaintiff to show that the defendant is not entitled to summary judgment.  Holloman, 370 F.3d at 1267.

A government official is entitled to qualified immunity unless, at the time of the incident, preexisting law provided that official with "fair warning" that her acts were unconstitutional. Holloman, 370 F.3d at 1277.[15]  The Supreme Court has enunciated a two-part test that requires the court to first ask: (1) whether the plaintiff's allegations establish a violation of a constitutional or statutory right, and then (2) whether the right was "clearly established."  Hope, 536 U.S. at 739.  In this case, the parties do not dispute that disciplining a student on the basis of his race is a violation of a "clearly established" right.  The parties also do not dispute that Davis's conduct in disciplining Gracias, absent any racial animus, does *not* constitute such a violation.  An evaluation of the conduct, then, requires some examination of Davis's intent or motivation behind the actions she took.

Generally, courts in the Eleventh Circuit must apply an objective standard when judging what reasonable officials would understand about the rights created by federal law, and "the government actor's intent or motivation are insignificant in determining entitlement to qualified immunity." Wood v. City of Lakeland, 203 F.3d 1288, 1291 (11th Cir. 2000).  See also Evans v. Hightower, 117

---

[15]     The Eleventh Circuit Court of Appeals noted in Holloman that it had been "recently chastised" by the Supreme Court for its strict application of the denial of qualified immunity.  Before Hope v. Pelzer, the Eleventh Circuit Court of Appeals had required that qualified immunity protect government actors in all cases except where pre-existing law "'dictates, that is, truly compel[s],' the conclusion for all reasonable, similarly situated public officials that what Defendant was doing violated Plaintiff's federal rights in the circumstances."  Evans v. Stephens, 407 F.3d 1272, 1282 (11th Cir. 2005)(en banc), quoting Marsh v. Butler County, 268 F.3d 1014, 1031 (11th Cir. 2001)(en banc).  Consequently, qualified immunity protected all but the "plainly incompetent or those who knowingly violate the law."  Stewart, 908 F.2d at 1503, citing Malley v. Briggs, 475 U.S. 335, 341, 106 S. Ct. 1092, 1096, 89 L. Ed. 2d 271 (1986).

F.3d 1318, 1320 (11th Cir. 1997)(holding that negligence alone, absent any intentional government conduct, cannot form the basis of a claim under § 1983). This is not true, however, when the action — here, failing a student because of absences — becomes illegal only because of the actor's constitutionally impermissible motive in carrying out the action. The Eleventh Circuit Court of Appeals has stated that "[w]here the official's state of mind is an essential element of the underlying constitutional violation, the state of mind must be considered in the qualified immunity analysis or a plaintiff would almost never be able to prove that the official was not entitled to qualified immunity." Walker v. Schwalbe, 112 F. 3d 1127, 1131 (11th Cir. 1997).

Plaintiff in this case makes the circular argument that, because Davis is accused of intentionally discriminating against Gracias on the basis of his race and because the law is "clearly established" that intentional racial discrimination is illegal, Davis cannot be qualifiedly immune. Of course, if that logic were to prevail, qualified immunity would never apply where a complaint alleges intentional discrimination. Beyond a mere allegation of improper animus, the plaintiff must come forward with substantial evidence from which a jury reasonably could find that the defendant acted with an improper motive. Only by doing so does the plaintiff show that there are genuine issues of fact material to that element of the claim. Without such a showing, the court and jury are left merely to speculate about the state of mind of the defendant, and speculation cannot refute the defendant's denial if improper motive.

It has been established that disciplining students is a discretionary function for purposes of qualified immunity. See, e.g., Denno v. School Bd. of Volusia County, 218 F.3d 1267 (11th Cir. 2000). There is no question that Davis was imposing discipline when she sent Gracias to alternative

school, suspended him for fighting, and failed him on the basis of his unexcused absences.  The issue, then, is whether plaintiff has established a "genuine issue of material fact that the true reason for the punishment" was race.

In this case, plaintiff alleges that Davis's motive in failing Gracias was racist, and that the excess absences were "created" by Davis when she suspended him for three days for fighting, which resulted in three unexcused absences.[16]  There is no allegation that the policy Davis implemented – failing a student who has more than four unexcused absences – was not facially neutral.  Thus, unless there is substantial evidence sufficient to create a dispute of fact concerning Davis's motivation for suspending plaintiff for fighting, plaintiff will not be able to show that implementation of the attendance policy was at all discriminatory.  In short, plaintiff must present evidence allowing the inference that Davis "manufactured" absences for Gratias in order to fail him for excessive absences.

The plaintiff offers the following evidence to demonstrate that Davis was biased against Hispanic students.  Plaintiff argues that Davis transferred a "problem teacher" to the school's "English as a Second Language Program," stating that she would do "less harm down there with those Mexican kids" than she had done with white students.  Plaintiff offers this through the

---

[16]     The court need not consider the absences treated as unexcused but for which Gracias and his guardian allege a written excuse was submitted to the school.  Even if all of those absences were excused, the three absences that resulted from the suspension, in addition to the two absences that resulted from the six tardies (which Gracias does not dispute) were sufficient to have triggered a "failure due to absences" pursuant to school policy.  Furthermore, even though Gracias and his guardian allege that the written excuses were submitted to the school, there is no evidence or allegation that the excuses were disregarded by Davis on account of his race, or that Davis played any role in discounting, losing, or ignoring the excuses.  Even assuming, as the court must at this stage, that Davis did obtain valid excuses and did submit them to the school secretary, the only evidence in the record regarding those excuses is that they were never properly entered into the school's computer system, which is the responsibility solely of a school clerical worker.

testimony of Maurice McGee, a school employee, who testified that the then-superintendent of the

school system told him in 1999 that Davis made such a statement.  Plaintiff further argues that Davis

told a group of Hispanic female students that because of their "fussing and fighting" they "were not

very well thought of."  This statement was related to McGee by an unnamed student.  Defendant

moved to strike these statements, asserting that McGee is not competent to testify as to what Davis

said because he has no first-hand knowledge of her alleged statements, and because the statements

are inadmissible hearsay.  is, in all respects other than name, to be treated as a suit against the entity

The court agrees that McGee's second-hand recitation of what Davis allegedly said to someone else,

offered to prove her bias, is not admissible.  By separate order, the motion to strike (court document

#48) will be GRANTED.[17]

---

[17]     In response to the defendant's motion to strike the statements as hearsay, plaintiff
asserts two grounds as bases for the admissibility of the statements.  First, Gracias asserts that the
statements are not offered to prove the truth of the matter asserted.  This argument is unavailing.
When McGee testified that Land told him that Davis made a specific statement, McGee's testimony
is offered for the truth of the matter asserted, namely that Davis, in fact, made certain statements
overheard by Land.  This is classic hearsay — McGee offers to testify to an extrajudicial statement
made by Land in order to prove that Davis, in fact, made certain arguably offensive statements.

Second, the plaintiff further argues that McGee's testimony is admissible because it involves
an admission by a party, Davis.  Plaintiff's reliance on Wright v. Southland Corp., 187 F.3d 1287,
1303-04 (11th Cir. 1999), is inapposite because in Wright, the plaintiff testified that the decision-
maker told him directly that "he might want to cease working as a 7-11 store manager because he
may be getting too old to understand the store's new computer programs."  There, the party
admission was made directly to the witness.  In this case, McGee can do nothing more than repeat
statements made to him that purported to report statements made earlier by Davis.  Again, this is
hearsay and not an admission by a party.  If McGee himself had heard Davis make such statements,
the situation would be different; or, if Land and the student testified to the statements they allegedly
heard from Davis, the situation would be different.  But here McGee can only testify that Land, on
one occasion, and an unidentified student, on another, repeated to him statements they purportedly
heard Davis make.  The attempt by McGee to prove the fact of certain statements by Davis relies
upon hearsay, that is, the extrajudicial statements by Land and the unidentified student.

Furthermore, even if the two statements were capable of being reduced to admissible form

Next, plaintiff asserts that Davis once proposed a separate school for students who did not speak English, cut the "PACERS" program that benefitted students who were learning to speak English, and diverted personnel to regular school duties from a program designed to serve migrant students.  These allegations also are insufficient to create a genuine issue of material fact as to Davis's state of mind.  They may reflect inappropriate attitudes toward non-English-speaking students, and perhaps even a hostile attitude toward Hispanics, but they do not reflect any causal link between Davis's beliefs and Gracias's discipline.  This is especially true in the context of Collinsville, where more than half of the students are Hispanic.  Gracias's attorneys make the illogical assumption that Davis was biased against all Hispanic students, yet singled out Gracias from hundreds of Hispanic classmates for discriminatory discipline.

There is no evidence in the record that Davis made any decision about Gracias based on his race.  There is no evidence that non-Hispanic students who engaged in the same or similar conduct as Gracias were disciplined less harshly than Gracias.  Furthermore, in some of the instances cited by Gracias as reasons for disciplinary action, the accusations of misconduct were made by teachers

---

and were considered by this court in deciding the instant motion, they would not affect the outcome. The statements are not direct evidence of discrimination.  Schoenfeld v. Babbitt, 168 F.3d 1257, 1266 (11th Cir. 1999)(holding that direct evidence consists of "only the most blatant remarks, whose intent could be nothing other than to discriminate").  Even if considered circumstantial evidence, both alleged statements are more akin to stray and isolated remarks, remote in time from the incidents complained of.  See, e.g., Dilla v. West, 4 F. Supp. 2d 1130, 1140 (M.D. Ala. 1998).  The statements require not only an inference that Davis is biased against Hispanic students, but also that bias was the cause of her imposition of discipline against Gracias.  The remark allegedly made to the Hispanic girls does not appear to be race-based, and is so ambiguous as to be almost meaningless. Neither statement was made in relation to the plaintiff, and so is, at best, minimally probative of the reason that Davis disciplined Gracias.  Carter v. City of Miami, 879 F.2d 578, 582 (11th Cir. 1989). Accordingly, even if admitted, the statements are not so substantial as to create a genuine issue of material fact as to plaintiff's claims that Davis intentionally discriminated against Gracias.

not accused of any racial bias.[18]  It should be noted that Gracias does not deny that, if the accusations

regarding his conduct were true, his conduct warranted his punishment.  Accordingly, plaintiff has

failed to raise a genuine issue of material fact as to Davis's motive in imposing discipline.  As such,

plaintiff has failed to show a constitutional violation.  The defendant is therefore entitled to qualified

immunity.

In this case, Davis would be entitled to the protection of qualified immunity even if the

evidence presented by Gracias were sufficient to raise a genuine issue of material fact as to her

motive.  As the Eleventh Circuit Court of Appeals made clear in Foy v. Holston, 94 F.3d 1528 (11th

Cir. 1996), an official who has a discriminatory intent still may be shielded by qualified immunity

where she would have acted as she did even in the absence of a discriminatory motive.  Id. at 1534,

citing Mount Healthy, 429 U.S. at 286-87.  It is possible, the court concluded, for a defendant to be

motivated in part by a dislike for a protected group, but to still act lawfully.  Foy, 94 F.3d at 1534.

In this case, Gracias admits he engaged in the conduct — hitting Morales —  that justified the

punishment of suspension.  Davis's testimony is undisputed that she imposed Gracias's discipline

on the basis of his conduct and the disciplinary options that were available for use at her discretion.

Furthermore, the evidence indicates that Davis gave a "failure due to absences" to every one of the

24 students that school records showed had the requisite number of unexcused absences, the majority

---

[18]     Gracias was sent to alternative school for his angry behavior of yelling and breaking
a pencil, which was reported by his teacher, Mr. Watkins, and for making lewd gestures, which was
reported by another teacher, Ms. Armstrong.  Gracias denies engaging in some, but not all, of that
conduct.  He does not, however, dispute that those teachers reported that conduct to Davis, or that
Davis believed Gracias had engaged in that conduct when she imposed the punishment of alternative
school.

of whom were not Hispanic.  The list of 24 students was not compiled by Davis, and she apparently had no input into the compilation.  She merely approved the action that had, in effect, been recommended to her with regard to a group of mostly non-Hispanic students.  In other words, consistent with the attendance policy, she would have failed Gracias even if she had not had any bias against him.  As the court in <u>Foy</u> explained:

> Unless it, as a legal matter, is that the defendant's conduct – despite his having adequate lawful reasons to support the act – was the result of his unlawful motive, the defendant is entitled to immunity.  Where the facts assumed for summary judgment purposes in a case involving qualified immunity show mixed motives (lawful *and* unlawful motivations) and pre-existing law does not dictate that the merits of the case must be decided in plaintiff's favor, the defendant is entitled to immunity.

94 F.3d at 1535.  The court went on to note that immunity applies where "[n]o jury could find that it would have been unlawful for [the defendant] to do as [defendant] did *if* the [defendant] lacked discriminatory intent."  <u>Id.</u>  Applied to Gracias's case, <u>Foy</u> compels the conclusion that qualified immunity shields Davis unless no jury could find that a reasonable principal would have disciplined Gracias in the manner Gracias was disciplined absent some discriminatory motive.  <u>Id.</u>

In this case, even construing the facts in the light most favorable to plaintiff and considering evidence that likely could never be admissible, Davis had mixed motives in imposing the discipline on Gracias.  Plaintiff's evidence, if admitted and believed, could demonstrate that Davis had a general hostility toward Hispanic students, but even that attitude will not necessarily rob her of the qualified immunity applied to shield the defendant in <u>Foy</u>.  Certainly, it is not "plain under the specific facts and circumstances of the case" that any of the disciplinary measures taken were taken as a result of an unlawful motive.  So long as the actions taken could have been the product of a

lawful motive and the law does not dictate the outcome of the case for the plaintiff, qualified immunity continues to shield the defendant.

### D.  *Prima Facie* Case of Race Discrimination

Even if Davis were not qualifiedly immune, she still would be entitled to summary judgment on plaintiff's claims that his equal protection rights under the Fourteenth Amendment were violated by Davis's alleged race discrimination.  Such discrimination claims are analyzed under criteria similar to employment discrimination claims arising under Title VII.  Both require proof of purposeful discrimination.

Applying criteria similar to Title VII law to the facts of this case, a plaintiff may accomplish a *prima facie* showing by presenting to the court: (1) direct evidence that "discriminatory animus played a significant or substantial role" in the adverse decision, Eskra v. Provident Life and Accident Insurance Company, 125 F.3d 1406, 1411 (11th Cir. 1997), or (2) circumstantial evidence of discrimination, in accordance with the four-part test set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L.Ed. 2d 668 (1973), or (3) statistical evidence of a pattern of discrimination.  Zaben, 129 F.3d at 1457.  A disparate treatment claim like that presented here requires proof of discriminatory intent, either through the use of direct or circumstantial evidence.  See, e.g., Equal Employment Opportunity Commission v. Joe's Stone Crab, Inc., 220 F.3d 1263, 1286 (11th Cir. 2000).  Direct evidence establishes that intent without the need for any inference or presumption.  Id., quoting Standard v. A.B.E.L. Servs. Inc., 161 F.3d 1318, 1330 (11th Cir. 1998).  Where there is no direct evidence, the plaintiff must prove intent through circumstantial evidence

in accordance with <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).

In this case, as discussed *supra*, Gracias's *prima facie* showing turns on whether he has demonstrated that similarly-situated non-Hispanic students at Collinsville High School were disciplined less harshly for the same or similar conduct as Gracias.  Gracias offered to this court no statistical evidence that Hispanic students were differently disciplined, and he failed to name a single comparator.[19]  Consequently, he has failed to prove his *prima facie* case of discrimination.  Davis is entitled to summary judgment on his § 1983 claims for this additional reason.

As discussed more fully in relation to plaintiff's evidence in support of his claims that Davis is biased against Hispanic students, plaintiff has failed to show that there is a genuine dispute of fact that a discriminatory reason more likely motivated Davis to impose discipline upon Gracias than her proffered reasons.  For all the reasons set forth herein, Davis's motion for summary judgment on Gracias's discrimination claims are due to be granted.

## **IV.  CONCLUSION**

Accordingly, consistent with the foregoing discussion of the evidence presented by both parties in support of and in opposition to the motion for summary judgment, this court determines that defendant Davis's motion for summary judgment against plaintiff (court document #42) is due

---

[19]     Davis's affidavit asserts that only five of the 24 students failed for excessive absences during the 2001-2002 school year are Hispanic, out of a school that is 50% Hispanic.  This statistic refutes any "pattern" of anti-Hispanic animus on Davis's part.

to be granted as to all of plaintiff's claims against her.  Consequently, all of plaintiff's claims against

Davis are due to be dismissed with prejudice.

A separate order will be entered in accordance with the findings set forth herein.

Dated the 7th day of July, 2005.

T. MICHAEL PUTNAM
U.S. MAGISTRATE JUDGE